*James Smith, Jr., et al. v. Upper Chesapeake Medical Center Inc.*, No. 0927, September Term, 2024.  Opinion by Nazarian, J.

**CATASTROPHIC HEALTH EMERGENCY – STATUTORY IMMUNITY – HEALTHCARE PROVIDERS**

Statutory immunity under Md. Code (2003, 2022 Repl. Vol.), § 14-3A-06 of the Public Safety Article ("PS") applies to care given by health care providers acting in good faith under a state-declared emergency proclamation

**CATASTROPHIC HEALTH EMERGENCY – STATUTORY IMMUNITY – HEALTHCARE PROVIDERS**

The immunity afforded by PS § 14-3A-06 does not hinge on whether the healthcare provider treated a patient for an illness caused by the biological agent underlying a health emergency proclamation. *See* PS § 14-3A-02. Rather, the General Assembly conditioned immunity for providers only on actions taken in good faith and in response to the emergency proclamation.

Circuit Court for Harford County
Case No. C-12-CV-23-000075

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0927

September Term, 2024

_____

JAMES SMITH, JR., *ET AL.*

v.

UPPER CHESAPEAKE MEDICAL
CENTER, INC.

_____

Nazarian,
Zic,
Maloney, John M.
  (Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: May 4, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

James Smith, Jr. suffered a serious deep tissue injury while hospitalized during April and May 2020. Before Mr. Smith entered the hospital, Maryland Governor Lawrence Hogan, Jr. had declared a catastrophic health emergency in Maryland in response to the global COVID-19 pandemic ("COVID-19," the "coronavirus"). Mr. Smith's injury disabled him permanently, and he and his wife sued the University of Maryland Upper Chesapeake Medical Center, University of Maryland Upper Chesapeake Health System, Inc., Upper Chesapeake Medical Center, Inc., and Upper Chesapeake Health System, Inc. (collectively, "Upper Chesapeake" or the "hospital") for negligence and loss of consortium. Upper Chesapeake answered that it had been operating under modified protocols pursuant to the Governor's health emergency proclamation during Mr. Smith's hospitalization and, therefore, was immune from civil liability pursuant to Md. Code (2003, 2022 Repl. Vol.), § 14-3A-06 of the Public Safety Article ("PS"). The material facts were undisputed and, after a motion, a hearing, supplemental briefing, and a follow-up argument, the Circuit Court for Harford County agreed and entered summary judgment for the hospital. Mr. Smith appeals and argues that statutory immunity didn't apply unless Upper Chesapeake had treated him for COVID-19, which it hadn't. We affirm.

## I.    BACKGROUND

On March 5, 2020, Governor Hogan issued a proclamation, under authority granted to him in PS § 14-3A-02, that declared a state of emergency and the existence of a catastrophic health emergency due to COVID-19. A March 16 executive order recognized that the State needed health care providers "to respond to the . . . emergency, including for treatment, isolation, and quarantine," and the Governor ordered interstate reciprocity of

healthcare licenses, authorized inactive healthcare practitioners to resume practice without first seeking reinstatement, allowed practitioners to act beyond the scope of practice authorized by their license, activated the Maryland Responds Medical Reserve Corps, authorized the Maryland Secretary of Health (the "Secretary") to restrict elective medical procedures, and relaxed other healthcare practitioner licensing requirements. Md. Exec. Order (Mar. 16, 2020), https://health.maryland.gov/mbon/Documents/covid-19-executive-orders/20200316-Gov-Hogan-Executive-Order-Health-Care-Matters.pdf, *archived at* https://perma.cc/S8N4-Y84T. The Governor renewed the emergency proclamation on March 17, April 10, and May 6, 2020.

On March 23, 2020, and in response to the proclamation, the Secretary directed all hospitals to grant "temporary disaster privileges" to bring on licensed physicians who weren't on staff, cease all elective and non-urgent medical procedures and perform "only medical procedures that [were] critically necessary for the maintenance of health for a patient," and implement Centers for Disease Control ("CDC") guidelines for the strategic use of Personal Protective Equipment ("PPE"). By May 6, 2020, the State had experienced at least "27,000 laboratory-confirmed positive COVID-19 cases and nearly 1,300 related deaths . . . ." But that same day, the Secretary authorized healthcare providers to resume "elective and non-urgent medical procedures and appointments" (the "Amended Order") and advised that immunity under PS § 14-3A-06 wouldn't apply to providers "performing non-COVID-19 related procedures or appointments."

On April 5, 2020, a month after the Governor's proclamation, Mr. Smith came to Upper Chesapeake's emergency room suffering from "[a]cute respiratory failure," low

oxygen in his body tissue, and high levels of carbon dioxide in his blood. He presented with symptoms of "worsening fatigue," "shortness of breath," and "intermittent fevers." The hospital intubated him, placed him on a ventilator, admitted him into the Intensive Care Unit ("ICU"), and placed him in isolation with "enhanced droplet [and] contact precautions" to rule out COVID-19.

Mr. Smith had a fever on April 7 and April 8, and he tested negative for the coronavirus on April 8. Still suspecting COVID-19 infection, Upper Chesapeake elevated Mr. Smith's isolation status to "airborne, droplet, [and] contact precautions" due to "[h]igh suspicion of active COVID [i]nfection, critically ill or expected need for aerosol generating procedures requiring highest level of available isolation including [a] negative pressure room," and the hospital ordered another COVID test. Mr. Smith tested negative for the virus again on April 11, 2020, and the hospital lowered his isolation status back to "enhanced droplet [and] contact precautions," and he remained subject to those precautions until April 22, 2020. But he wasn't getting better—on or around April 13, Upper Chesapeake diagnosed him with "[b]ilateral pulmonary infiltrates," "[c]ardiomyopathy," and "[a]cute kidney injury" and ordered a palliative care consultation on April 14. After he showed signs of improvement, the hospital extubated him on April 21, and on April 29, a final COVID-19 test came back negative.

In the meantime, Mr. Smith remained at high risk for skin breakdown and required repositioning every two hours. Upper Chesapeake's medical records indicate that staff didn't meet that standard from April 7 to April 14, 2020. On April 14, staff discovered a deep tissue injury on his sacrum and ordered a wound consultation. He developed an

3

infected sacral decubitus ulcer that had become "unstageable" by April 27. The hospital performed a "[d]ebridement of [his] skin and subcutaneous tissue and muscle" on April 30, and Upper Chesapeake discharged him from care on May 5, 2020. At discharge, Mr. Smith continued to have a chronic sacral decubitus ulcer. After numerous debridement and skin graft procedures, the wound closed in November 2021 and left him permanently disabled.

During the entire period Mr. Smith was in the hospital, Upper Chesapeake was operating under an Emergency Response Plan in response to the Governor's emergency proclamation. As part of that plan, Upper Chesapeake adopted and implemented a COVID-19 response policy called the "Duration of Transmission-Based Precautions for Hospitalized Patients with COVID-19 and Persons Under Investigation" (the "isolation policy"). The isolation policy provided that the hospital would place a Person Under Investigation ("PUI") for COVID-19 into "enhanced droplet and contact" isolation status when a negative pressure room wasn't available, and staff would don full PPE, including "gowns, gloves, respirator . . . and eye protection" when administering care. Under the isolation policy, "airborne/droplet/contact" isolation required full PPE plus a negative pressure room "for COVID-19 positive [patients], especially [patients who were] critically ill and/or requir[ed] aerosol generating procedures." The policy provided further that PUIs with an initial negative test result should "remain in PUI status and in COVID-19 precautions" if they had an "[a]cute respiratory syndrome or distress of unknown etiology" or there was "[h]igh suspicion for COVID infection or co-infection based on clinical presentation and no alternate diagnosis." The policy directed staff to keep patients in airborne/droplet/contact isolation status if the patients continued to present "deteriorating

4

respiratory status that [would] necessitate positive pressure ventilation/intubation/high flow oxygen." Only when those conditions didn't exist could Upper Chesapeake remove the PUI indicator from the patient's chart, discontinue isolation precautions, and move the patient to standard precautions, which required only face masks and eye protection.

Mr. Smith's medical records referenced the Emergency Response Plan and cautioned that "[p]atient care and treatment decisions may be impacted as availability of resources become affected." Some of the elements of the plan modified the hospital's usual practices relating to isolation and PPE, including respirator requirements for any staff within six feet of or providing direct care to PUIs like Mr. Smith. Hospital staff testified that the "extreme circumstances" of working during the pandemic "truncated" their normal documentation practices and led to increased reliance on PPE, enhanced donning and doffing practices, and extra precautions. During that time, staff testified that they had limited PPE, which in turn reduced the number of times that ICU staff could enter and exit patient rooms, and they described the environment as "chaotic and very busy." For every contact- or airborne-isolated patient in the ICU, like Mr. Smith, staff had to put on PPE before entering one patient's room, then remove the PPE after leaving that patient's room and put on a new set of PPE before visiting the next patient. Staff testified further that not all the patients in the ICU had COVID-19, but most did.

Mr. Smith sued Upper Chesapeake alleging negligence and loss of consortium as a result of the deep tissue injury he suffered from the hospital's alleged failure to reposition his body. In its answer, the hospital asserted a defense of immunity from civil liability under PS § 14-3A-06. Later, Upper Chesapeake moved to dismiss Mr. Smith's complaint

or for summary judgment, asserting that immunity attached because the hospital was operating under its Emergency Response Plan in direct response to the Governor's emergency proclamation when it provided medical care to Mr. Smith.

At a hearing on Upper Chesapeake's motion, the parties agreed that the only issue in dispute was whether statutory immunity applied to the medical treatment Mr. Smith received from the hospital and that that was not a jury question. Upper Chesapeake denied that it sought blanket immunity or that medical malpractice claims could never exist during a catastrophic health emergency. Instead, the hospital argued that immunity was a fact-specific inquiry tied to the kind of healthcare provider, the timing of the treatment, and the impact of the emergency proclamation on normal hospital operations:

> THE COURT: Is it your contention, on behalf of the Defense here, that this immunity statute applied to any providing of any medical services whatsoever? . . . . That no doctor in the state of Maryland could commit medical malpractice at all [during a catastrophic health emergency]?
>
> [COUNSEL FOR DEFENSE]: No. . . . I think it would be whether the healthcare providers or the healthcare facility was operating under the state of emergency and catastrophic emergency proclamation. So, during this time period . . . there was a cancelation of non-urgent, unnecessary medical procedures and elective medical treatment. So, during that time period, certain healthcare providers were not providing care and treatment. I think though, in the context of this case, which the care at issue it's criticizing ICU healthcare providers that are providing necessary medical treatment—so, I do think that the initial immunity does apply very specifically to this case, based on the timing of treatment that's at issue.
>
> ***
>
> I think it's a little bit more specific of an inquiry. Because hospitals during this time period were not only—it's not so

6

> much as healthcare-provider specific, but also the fact that these healthcare facilities, the hospitals, were implementing certain policies and procedures to combat the COVID-19 pandemic.

***

> I would agree that certain procedures that have absolutely no bearing whatsoever on COVID-19, the facility that was providing the treatment that had nothing to do with COVID-19, it wasn't impacting the decisions that are being made to provide treatment to the patients, then, yes, I would agree that I don't think that there's an immunity that would . . . be applicable.

Upper Chesapeake argued that its pandemic response affected the treatment of all patients, including, and most acutely, the sickest patients in its ICU, like Mr. Smith. The hospital suggested that PS § 14-3A-06 grew out of an understanding that during a catastrophic health emergency, front-line providers like Upper Chesapeake weren't expected to perform to the ordinary standard of care, but rather to a "critical crisis standard of care," where they would be "practicing in unprecedented conditions that they've never experienced." Upper Chesapeake acknowledged that modified protocols pertaining to PPE and documentation altered the treatment Mr. Smith received from ICU staff.

Mr. Smith conceded that PS § 14-3A-06 applied when he first arrived at the emergency room because he presented symptoms compatible with COVID-19. But he argued that any statutory immunity stopped as soon as Upper Chesapeake ruled out COVID-19 and began to treat his other medical conditions because "at that moment in time, he ha[d] converted to a non-COVID suspect [receiving] non-COVID treatment." Mr. Smith reasoned that because he tested negative for the virus before he developed his deep

7

tissue injury on April 14, the relationship between the injury and a known or potential COVID-19 diagnosis had become too attenuated from any COVID-19-related deviation from the standard of care and, therefore, no immunity should apply.

The circuit court considered different scenarios under Mr. Smith's statutory construction, for example:

> THE COURT: Let's say [defense counsel] had an affidavit from the chief physician at Upper Chesapeake that said on the day that [a] hypothetical individual had gotten in his car accident and was admitted, and the hospital's now being sued, that we only had two nurses on staff 'cause everybody else was out on COVID. . . . I think it necessarily involves some underlying understanding of the circumstances at the time . . . .
>
> ***
>
> I mean, if a well-intentioned doctor, who's running around the hospital trying to treat 100 different patients that's doing the best they can, that is falling below the standard of care but acting in good faith, [they are] immune. If the circumstances support it.
>
> ***
>
> So, is it your position that [Mr. Smith] comes in, he's got a— there's a veil of immunity that's sort of floating over him for [a] period. But then, when a COVID test comes back negative, one of the first ones or the second one comes back negative, then the immunity is lifted. . . . So, would then—it would be odd, right, for immunity to then just evaporate. And then now the doctors are under a very strict standard of care in trying to manage his treatment. Help me through this.

At the same time, the court thought it would be tougher for immunity to reach the care of a patient with no COVID-19 symptoms who sought treatment solely for a non-COVID issue, purely under a theory of operational impact.

8

The court also considered our unreported decision in *Constantine v. Balt. Wash. Emergency Physicians*, No. 2132, Sept. Term 2022 (Md. App. February 28, 2024), the only appellate decision addressing the reach of statutory immunity under the Governor's COVID-19-related emergency proclamation.[1] In that decision, we concluded that statutory immunity did apply to claims brought by a patient whom the hospital suspected of having COVID-19 but whose injury arose from a failure to treat the patient's non-COVID-19 condition. *See* Section II.A below. Mr. Smith maintained that under *Constantine* statutory immunity applies when providers treat a person who has COVID-19 or is suspected of having it and that there must be "a rational relationship at that moment in time to COVID-related treatment. Even if it was [a] misdiagnosis." In his view, his negative COVID-19 tests created a "clean break," and without an operational connection between the virus and his care, he argued, PS § 14-3A-06 wouldn't apply. Upper Chesapeake countered that statutory immunity covered the treatment it provided Mr. Smith in April 2020 in the ICU under the circumstances because "[the hospital was] impacted by the response to COVID-19."

The circuit court was reluctant to remove context and operational impact from the analysis altogether. The immunity question, the court reasoned, would depend necessarily "on the facts and circumstances at the time," and it drew an analogy to the qualified

---

[1] Under Maryland Rule 1-104(a)(2)(B), parties may cite an unreported decision issued on or after July 1, 2023 as persuasive authority when there is "no reported authority [that] adequately addresses an issue before the court." This is a situation where the citation was appropriate—*Constantine* was (until now) the only appellate opinion addressing statutory immunity under Governor Hogan's COVID-19 emergency proclamation.

immunity doctrine for police officers and other public officials, under which courts must "look at the underlying facts and circumstances of what [the officers] were [facing] at the time." The court contemplated how the immunity provision worked when viewed against the systemic impact of the pandemic on the hospital relative to Mr. Smith's individual COVID-19 risk:

> THE COURT: What about this: [Upper Chesapeake was] worried about—what if they were worried about infecting [Mr. Smith?] Let's say now that he was ruled out for COVID . . . and you have your limited staff of nurses scurrying around—you have COVID patients over there in the hospital. You have people over here that are having acute care. And you have Mr. Smith that's on a level where there's isolation and they're worried about infecting him. And they're worried about transmitting him from patient A on the third floor to where he is on the fourth floor.
>
> And in a situation where they have very, very, very limited staff and they're working around the clock and all things, which, again, must be supported by the record of course. And then they have to take all these extra measures with every single patient. With the PPE, they have to take it off, put it on.
>
> So, while [Mr. Smith] has no longer become a COVID concern himself, they're worried about infecting him with COVID and then causing him to die as a result, which is putting a whole concern on the hospital as a whole. So, it's stressing the whole, kind of, organization. What do you say to that?
>
> [COUNSEL FOR MR. SMITH]: . . . At some point, the immunity cuts off for the hospital. And that sounds harsh. I get it. And I sense the Court realizes how harsh that is on the hospital staff and the hospital as an institution. But it's as—
>
> THE COURT: No, no. I don't think it's harsh. I think it's exactly the way it's intended to work. Like, I do think the immunity does end at some point. I mean, I think that there— that this is sort of envisioned about in [the *Constantine*] opinion a little bit.

> But under the facts of this case, what I'm struggling with is did that point in time occur. Your argument is of course it did. It did because he went from being—he personally was no longer a concern for COVID himself and that the hospital in treating him for the condition that he had, the kidney condition he had, was negligent as a result.
>
> I'm just—it's a little bit kind of too clear for me that he gets a negative test back in the middle of his stay and, poof, the immunity goes away. And then the hospital—the nurses are supposed to just act as business as usual all of a sudden.

After taking a recess, the court returned and shared its initial impressions:

> So, in trying to wrap my head around what this concept of immunity means in this circumstance, taking us back to what life was like back in April of 2020 . . . I believe that there's a very strong case for immunity to apply here upon—certainly upon Mr. Smith's admission to the hospital.
>
> ***
>
> The concerns of COVID are not eliminated simply by a return of a negative test. There continues to be a concern, particularly during that period of time, of a false negative or a patient being infected himself by other COVID patients that are in the hospital or by the people that are providing him or her with medical care.
>
> We also have the issue of the hospital being placed under enormous pressure that healthcare providers were under during this really, really challenging period of time. So, there's been a lot of discussion about whether or not there is "blanket immunity" under these circumstances.
>
> I don't think it works like that. I think it's a facts and circumstances inquiry. And that's supported by some of the discussion in the *Constantine* case. . . . I believe it applies to— it depends on whether or not under the circumstances that not only the patient was confronted with, what the circumstances were at the time [for] the hospital as well.

The circuit court then asked the parties to supplement the record and directed Upper

11

Chesapeake specifically to provide information to aid the court's understanding of the medical records pertaining to Mr. Smith's isolation orders; the significance of the hospital's isolation and PPE conservation policies relative to those orders; and the effective date of those hospital policies. The court also invited Mr. Smith to add any information that he thought would generate a dispute of material fact bearing on whether immunity under PS § 14-3A-06 stopped applying to his care after a certain point during his admission.

Upper Chesapeake supplemented the record with affidavits from its Director of Infection Prevention, Colleen Clay, and its ICU Nurse Manager, Kathy Lynch. Ms. Clay declared that the pandemic overwhelmed the hospital with critically ill patients and that in response to state and CDC guidance, she helped establish prevention and control protocols. She identified COVID-19 ICU procedures in effect at the time of Mr. Smith's hospitalization and with which she was familiar: the isolation policy; the PPE conservation guidance; and the hospital's Inpatient COVID-19 Plan. To combat the spread of COVID-19 during this time, she affirmed, Upper Chesapeake "suspended visitation, halted all elective and non-urgent medical procedures, and implemented guidelines, policies, and procedures concerning prioritization and conservation of PPE pursuant to CDC and Maryland State guidance."

Ms. Lynch declared that she was familiar with the COVID-19 response efforts implemented by Upper Chesapeake's ICU and their impact on ICU "operations and delivery of care." During Mr. Smith's hospitalization, she explained, the ICU cared for all patients with or suspected of having COVID-19 "who required mechanical ventilation." She was familiar with the ICU procedures in place at the time of Mr. Smith's admission

and stated that, under those policies, "all COVID-19 patients or PUI requiring hospitalization were placed in isolation," under either "Airborne, Droplet and Contact precautions with negative pressure room or Enhanced Droplet and Contact Precautions without negative pressure room." Hospital policy directed that even if a PUI received a negative test result, the hospital would keep them in isolation under these precautions for at least seven days and if the PUI's respiratory status continued to deteriorate such that they required intubation still, they "would remain in PUI status and in isolation with COVID-19 precautions."

Ms. Lynch described the PPE donning and doffing procedures that ICU staff had to follow when entering or exiting the room of any patient in isolation and under COVID-19 precautions. The additional time spent following those procedures, she reported, "impacted the amount of time [staff could spend] with COVID positive patients, PUI, and non-COVID-19 patients." She declared that staff attending to Mr. Smith had to "don and doff full PPE including gowns, gloves, respirator . . . full-face shields, and eye protection upon entering/exiting his room." She stated that Upper Chesapeake limited entry to the rooms of isolated patients under COVID-19 precautions to "pertinent and essential staff" as part of its efforts to "prevent unnecessary exposure to patients, visitors, and staff, and to preserve PPE." She stated also that staff augmented care with "telemedicine and other communication methods to reduce unnecessary in-person contact," which affected the ICU's normal protocols for providing care and performing patient rounds. Because of Mr. Smith's symptoms and his "deteriorating respiratory status requiring mechanical ventilation," she affirmed, the ICU classified him as a PUI and kept him in isolation with

COVID-19 precautions consistent with their isolation policy, where he remained until April 22, 2020.

Upper Chesapeake supplemented the record as well with its Inpatient COVID-19 Plan and PPE Donning and Doffing Guides. The inpatient plan set forth elevated staff precautions as to patient placement, isolation status, PPE, patient care equipment and transport, patient care, aerosol generating procedures, hand hygiene, and environmental cleaning and disinfection. The guides provided step-by-step instructions for putting on and taking off PPE with assistance from another staff member.

Mr. Smith supplemented the record with medical records and affidavits from his experts, Inocencia Carrano and Brooke Menefee, who supported his position that treatment for suspected COVID-19 had ended by April 12, 2020.

After hearing additional oral argument from the parties, the circuit court granted summary judgment to Upper Chesapeake on June 17, 2024. Mr. Smith noted a timely appeal.

## II.    DISCUSSION

Mr. Smith raises two questions on appeal[2] that we rephrase slightly: *first*, whether

---

[2] Mr. Smith phrased his Questions Presented as follows:

1.   Whether the Governor's Emergency Proclamation invoking MD. CODE ANN., Pub. Safety, § 14-3A-06 extends immunity for medical negligence committed while providing normal/routine treatment that is unrelated to the treatment for the COVID-19 virus?

2.   Whether subjecting a non-COVID-19 patient to COVID-19 restrictive protocols confers immunity to the healthcare provider?

Continued . . .

14

the Governor's emergency proclamation extended immunity for medical negligence committed while treating a condition other than known or suspected COVID-19; *second*, whether subjecting a non-COVID-19 patient to COVID-19 restrictive protocols conferred immunity to the healthcare provider.

We review *de novo* whether the court's grant of summary judgment was correct legally. *See Heneberry v. Pharoan*, 232 Md. App. 468, 477–78 (2017) (*citing Hrehorovich v. Harbor Hosp. Cntr., Inc.*, 93 Md. App. 772, 785 (1992)). We hold that statutory immunity under PS § 14-3A-06 applies to care provided by health care providers that are acting in good faith under an emergency proclamation and that the circuit court granted summary judgment correctly in this case.

### A. Statutory Immunity Under PS § 14-3A-06 Was Appropriate Here Because Upper Chesapeake Acted In Good Faith Under The Governor's Emergency Proclamation.

*First*, Mr. Smith argues that the circuit court erred when it recognized statutory immunity for an action that, he says, didn't relate to the treatment of COVID-19 or the care of a COVID-19 patient, in effect granting Upper Chesapeake "blanket immunity" for treating suspected COVID-19 patients. He suggests that the Secretary's Amended Order is essential to interpreting the scope of statutory immunity in this case and emphasizes that its plain language excludes "routine care unrelated to treating COVID-19." As a result, he

---

Upper Chesapeake stated the Question Presented as one:

> 1. Whether Upper Chesapeake Medical Center, Inc. is entitled to statutory immunity under PS § 14-3A-06 for the medical care provided to Mr. Smith while he was in isolation in the Intensive Care Unit during the infancy of the COVID-19 catastrophic health emergency?

asserts that Upper Chesapeake had to provide normal preventive care to avoid deep tissue injuries and didn't do so here.

In response, Upper Chesapeake contends that the plain language of PS § 14-3A-06 doesn't limit immunity only to actions treating COVID-19 and that Mr. Smith's narrow reading runs counter to the statute's purpose and intent. Further, the hospital argues that the Secretary lacks the authority to define the scope of statutory immunity and that the Maryland Department of Health's (the "Department") interpretation applied only to "the resumption of elective and non-urgent procedures and appointments," which took effect after Mr. Smith's discharge. Mr. Smith replies that the effective date of the Amended Order is irrelevant and that it would be illogical to conclude that the legislature intended immunity for the treatment of conditions that aren't the subject of a state emergency proclamation.

*Second*, Mr. Smith asserts that the circuit court reasoned erroneously that because he remained subject to Upper Chesapeake's COVID-19 protocols, the statute conferred immunity for the treatment he received after the hospital ruled out a COVID-19 diagnosis. By counting COVID-19 precautions as COVID-19 treatment, he argues, the court widened the scope of immunity beyond that established by the Amended Order.

Upper Chesapeake maintains that it adopted multiple emergency protocols during the pandemic that affected the treatment Mr. Smith received and that its actions under those policies related sufficiently to the pandemic and the emergency proclamation such that statutory immunity applies. As reinforcement, the hospital points to modified policies regarding PPE and how the need to conserve limited PPE resources, limit unnecessary exposure, and control the spread of the virus affected the staff's ability to spend time with

patients. Upper Chesapeake contends that even though Mr. Smith had tested negative for COVID-19, he remained critically ill, compelling the hospital to suspect COVID-19 infection and keep him in isolation in the ICU with COVID-19 precautions in place during the period of alleged negligence. In this respect, it argues, the care Upper Chesapeake provided "cannot be extricated from COVID-19," and Mr. Smith didn't contest the impact its COVID-19 policies had on the hospital's treatment capacity during that time.

Although we agree with Mr. Smith that the immunity statute doesn't confer blanket immunity on all health care providers for all claims arising during declared emergencies under any circumstances, we hold that the text of the statute does immunize care provided in good faith in compliance with directives issued in connection with a declared emergency. The text doesn't point to the degree of connection between the diagnosis or the care and the source of the emergency, in this case COVID-19, but rather to the good faith of the provider's response to the Governor's declared emergency. The statute recognizes that the declared emergency alters providers' ability to provide care in accordance with the usual standard of care. So long as the provider, in good faith, has adopted and is executing protocols that respond to the declared emergency and the directives of the Secretary, the provider is entitled to immunity for claims arising from that care.

The Public Safety Article defines the health emergency powers that the Governor can invoke under appropriate circumstances. PS § 14-3A-01 *et seq*. When those conditions are present—and nobody disputes that the COVID-19 pandemic qualified—Title 14, Subtitle 3A authorizes the Governor to issue a proclamation that a "catastrophic health emergency" exists and to take certain emergency management actions. PS

17

§§ 14-3A-02(a)–(b), 14-3A-03. The statute prohibits healthcare providers from refusing to comply with emergency orders, requirements, or directives issued by the Executive. PS § 14-3A-08 (a)(1), (b)(1). But these statutory powers aren't limited to any particular kind of health emergency and the statute doesn't prescribe specific emergency measures. To the contrary, emergencies may require providers to provide care under conditions, and in manners, that they wouldn't if they followed normal regulatory standards or the governing standard of care. And in recognition of this trade-off, the statute states that "[a] health care provider is immune from civil or criminal liability if the health care provider acts in good faith and under a catastrophic health emergency proclamation." PS § 14-3A-06.

The critical words in that sentence are "good faith." The parties don't dispute that the Governor issued a proclamation that declared COVID-19 a catastrophic health emergency for purposes of PS § 14-3A-02, that the emergency proclamation was in effect during Mr. Smith's hospitalization, or that Upper Chesapeake acted in good faith when it cared for him. But although the text of PS § 14-3A-06 states plainly that care provided by a healthcare provider in good faith under a declared health emergency cannot be grounds for civil liability, Mr. Smith and Upper Chesapeake disagree about where the hospital's immunity begins and ends. Mr. Smith asks us to interpret a provider's actions "under a catastrophic health emergency proclamation" narrowly, and to limit immunity to actions that treat a patient for illness caused by the biological agent that gave rise to the emergency proclamation—here, COVID-19. *See* PS § 14-3A-01(b)–(c) (definitions of "catastrophic health emergency" and "deadly agent"). Upper Chesapeake argues for a broader construction that protects actions healthcare providers had to take because of the

18

emergency proclamation, even if those actions affected the care received by patients who hadn't tested positive for COVID-19. We look to the text of the statute, and that language, on its face, confers immunity bounded by the provider's good faith adaptation to the emergency, in compliance with the directives of the Governor and executive branch officials authorized to declare it. So long as the provider's deviations from the standard of care are grounded in policies or protocols that represented a good faith response to the emergency—and in this case, they did—the provider is immune from liability.

The historical context that led to the creation of the immunity provision only bolsters this reading of the text. *See Lyles v. Santander Consumer USA Inc.*, 478 Md. 588, 603 (2022) (reviewing courts can look beyond the plain meaning of the statute to consider its context, overall statutory scheme, and history of legislative enactments). Section 14-3A-06 originated from an emergency law passed after the terrorist attacks of September 11, 2001. *See* 2002 Legislative History for SB 0234—Emergency Bill; Fiscal Note at 5;  Revised Fiscal Note at 7; Floor Report at 5; and Statement from Office of the Governor to Senate Education, Health, and Environmental Affairs Committee dated February 6, 2022 at 1 in legislative file for Senate Bill 234. In 2002, the General Assembly granted the Governor enhanced emergency health powers so that the Executive could more effectively "handle large-scale communicable threats, such as plague and smallpox" and "address mass casualty or bioterrorism events, preparedness, disaster planning, mandatory training, or stockpiling of medication and equipment." *See* 2002 Md. Laws, Chap. 1, 1 (the purpose of emergency health bill was to "specify[] the powers of the Governor during a catastrophic health emergency" and "authoriz[e] the [Health] Secretary to require certain health care

19

practitioners to implement certain plans," among others); Floor Report in legislative bill file for Senate Bill 234 at 2; Md. Gen. Assembly, Dep't of Legis. Services, Revised Fiscal Note, S.B. 234, 416th Sess., at 7 (2002). The law responded to the recommendations of a joint task force that the General Assembly appointed in an effort "to prepare a legislative response to terrorism and related topics." Revised Fiscal Note, S.B. 234, at 6; Bill Summary in legislative file for House Bill 296 at 8 (emergency health measure part of anti-terrorism package made up of nine bills to address "anti-terrorism and emergency preparedness issues."). And the legislative file recounts expressions of concern about "the capacity of Maryland hospitals to handle a large scale epidemic." Revised Fiscal Note, S.B. 234, at 7.

At first, S.B. 234, the bill that would become PS § 14-3A-01 *et seq.*, didn't have an immunity provision. *See* S.B. 234, First Reading, 2002 Gen. Assemb., 416th Sess. (Md. 2002). The General Assembly added it after receiving stakeholder input. Md. Gen. Assembly, Educ., Health, and Env't Affairs Comm., Amendments to Senate Bill No. 234, S.B. 234 -154831/1, 416th Sess., at 15 (2002); Floor Report in legislative file for Senate Bill 234 at 2 (amendment "provides immunity for civil and criminal liability to a health care provider acting in good faith and in accordance with the proclamation."); Unofficial Copy of House Bill 296 in legislative file for Senate Bill 234 at 6.

The General Assembly amended S.B. 234 to provide "immunity for health care providers" when they acted in good faith pursuant to a state-proclaimed catastrophic health emergency. *See* Unofficial Copy Of Senate Bill in legislative file for Senate Bill 234 at 7 (marginalia); Revised Fiscal Note, S.B. 234, at 3 (amendment to grant immunity from "liability related to the provider's actions taken under the proclamation" adopted). With

20

that, the emergency law included the following immunity provision:

> *Immunity of health care provider acting under proclamation;*
> *exception.*—A health care provider acting in good faith and in
> accordance with a catastrophic health emergency proclamation
> is immune from civil or criminal liability related to those
> actions, unless the health care provider acts with willful
> misconduct.

2002 Md. Laws, Chap. 1, sec. 1, § 2-202(g), 8; Md. Code (1957, 1997 Repl. Vol., 2002 Cum. Supp.), Art. 41 § 2-202(g) (repealed 2004).

In 2004, the General Assembly revised the Maryland Code and carried the immunity provision over to the Public Safety Article. *See* 2004 Md. Laws, Chap. 26, at 172 (an act to revise the code "without substantive change [of] provisions related to . . . the Governor's emergency powers for catastrophic health emergencies."); PS § 14-3A-06. In its current, more succinct form, the statute states that a "health care provider is immune from civil or criminal liability if the health care provider acts in good faith and under a catastrophic health emergency proclamation." PS § 14-3A-06.

The immunity provision is part of a statutory scheme meant to address concerns about State anti-terrorism efforts and emergency preparedness, Floor Report in legislative bill file for Senate Bill 234 at 2, 4–5, including "the capacity of Maryland hospitals to handle a large scale epidemic," Revised Fiscal Note, S.B. 234, at 7, and its plain language reflects that purpose. Senate Bill 234 was an emergency bill that enhanced the emergency health powers of the Governor so that the Executive could manage a coordinated, effective response to public health crises by issuing directives to public and private actors. *See* PS §§ 14-3A-03–14-3A-05. The law envisioned a collective emergency response to statewide

21

public health threats that would require departures from the status quo. *Id.* Mr. Smith's interpretation would have Upper Chesapeake's ICU staff meet the normal standard of medical care while operating under modified protocols during a catastrophic health emergency, switching gears as they go, depending on the COVID-19 presentation and specific medical circumstances of each patient. But the language of the immunity provision isn't so conditioned. And it isn't hard to imagine how Mr. Smith's reading of the statute could lead to different immunity answers for different patients receiving care at the same hospital at the same time, depending on their diagnoses. That wouldn't make sense. The declared emergency forced everyone to deviate from the standard of care in ways that nobody could predict with precision, and an uncertain or uneven notion of statutory immunity would undermine the emergency declaration's critical purpose.

We can see from the text that the General Assembly conditioned immunity for healthcare providers only on good faith and an emergency proclamation under PS § 14-3A-02. The immunity provision limits liability concerns that otherwise might restrict healthcare providers' ability or willingness to act quickly in a declared emergency. Mr. Smith's interpretation would have providers observe emergency protocols only for ICU patients marked as COVID-19 (known or suspected) but follow the normal standard of care for ICU patients without that label. But this interpretation is problematic in two key respects. *First*, those individualized distinctions create minefields for providers to navigate during a declared health emergency and could force providers to prioritize treatment of non-COVID-19 patients to mitigate liability risks over care to COVID-19 patients, for whom they would have immunity. Nothing in the text or legislative history of S.B. 234

22

suggests that the General Assembly expected frontline providers to provide different levels of care to different people in the event of an emergency, act of terrorism, or a "large scale epidemic." *See* Floor Report in legislative bill file for Senate Bill 234 at 2, 4–5; Revised Fiscal Note, S.B. 234, at 7. *Second*, it fails to recognize that modified, emergency procedures in an acute care setting that have been adopted because of a state-declared health emergency undoubtedly will affect the resources and level of care available to all patients in that unit, regardless of whether COVID-19 is in their medical chart.

In this case, the circuit court couldn't get comfortable with a statutory interpretation that didn't account for the pandemic and its overall impact on a hospital's normal operational capacity. The court concluded that interpreting the immunity provision to apply based only on an individual's diagnosis of and treatment for COVID-19 (known or suspected) would be unreasonable and unrealistic because it would require healthcare providers to run two systems of care during catastrophic health emergencies:

> [The hospital has] a staff meeting and, as a result, you know, Mr. Smith's care needs to change, but the individual that's in the room right next to him, we still have immunity as to that individual. So, it's a bit hard for me to accept that that would be the way that this situation was supposed to work. Particularly in April of 2020. . . . I don't believe immunity pops like a bubble. And it seems to me that you would have me make a finding here that the moment [Mr. Smith's] COVID test comes back negative, and he's effectively ruled out as having COVID—he may still be at risk of contracting COVID—but the moment that his COVID test comes back negative, then it's like a balloon. His bubble—the immunity that applies to his healthcare provider is popped. But it's still in effect as to all these other people that are at the hospital that are under suspicion of having COVID or that do have COVID or that they have concerns about those other individuals contracting COVID.

23

THE COURT: And then you believe it's a reasonable interpretation that—that COVID test comes back and indicates Mr. Smith is, at that point, negative for COVID. Then it's business as usual as it pertains to this individual.

[COUNSEL FOR MR. SMITH]: Well, I—

THE COURT: They are required to adhere to the standard of care—

[COUNSEL FOR MR. SMITH]: Yes.

THE COURT: —as if we were doing this in April of 2024?

[COUNSEL FOR MR. SMITH]: I do believe that to be the case, Your Honor. That is the clear position of Mr. Smith.

***

THE COURT: An individual that enters a hospital, who clearly immunity would apply to on day one, certainly day two, three, four, five, six, seven, eight, nine, or so. And then to say at some point during this individual's hospital stay, during the midst of a public health catastrophe, during a period of time where all of the affidavits . . . indicate that [Upper Chesapeake] was employing the appropriate COVID-related restrictions, all the policies and procedures that were in place that pertain to the use of PPE, all the policies and procedures that were in place in terms of limiting exposure to staff and patients, and how the PPE was . . . donned and doffed in and out of the rooms, and the great confusion that the hospital is faced with during this period of time, it would defy logic to say that . . . immunity would've then popped like a bubble and would've gone away.

And I don't believe that is what the statute is intended to tell both patients and the hospital staff. I don't believe it would allow the hospital to adequately design . . . a system of care in the midst of this pandemic—not only in the midst of a pandemic but in the very early stages of a very confusing and concerning catastrophic health emergency as it said.

The court found the duration and timing of Mr. Smith's admission—a month-long stay

mostly in April 2020, during "the most intense, uncertain, arguably frightening period of the pandemic"—counseled in favor of a broader concept of immunity. The court analogized the proper scope of immunity here to the qualified immunity extended to police officers and state officials—a fair comparison in concept, although here, unlike the civil rights setting, at least we have a statute to guide the line-drawing exercise more precisely.

Our opinion in *Constantine v. Balt. Wash. Emergency Physicians*, No. 2132, Sept. Term 2022 at \*1 (Md. App. February 28, 2024) persuaded the circuit court that the immunity analysis depends on the connection between the care and the purpose of the emergency protocols. In that case, the appellant came to the emergency room, reporting "fever, muscle aches, chills, nausea, mild cough and diarrhea" and said she suspected that her coworkers were sick with COVID-19. *Id*. at \*1. The hospital suspected that she had COVID-19 but didn't test her because she didn't meet the applicable testing criteria. *Id*. She came back to the emergency room three days later and presented "knee and back pain, sweats, chills and a cough." *Id.* The hospital still suspected she had COVID-19 but discharged her again without testing for it. *Id.* Five days later, another hospital diagnosed her with sepsis and endocarditis; she tested negative for COVID-19 at that time. *Id.* The appellant sued the first hospital and it claimed immunity under PS § 14-3A-06. *Id.* Like Mr. Smith, the patient there argued that the statute didn't create "blanket immunity" for any good faith medical care performed during a catastrophic health emergency and that immunity applied only to a hospital carrying out specific state emergency directives. *Id.* at \*3. The hospital advocated for "expansive" immunity, marked only by issuance and expiration dates of the emergency proclamation. *Id.* at \*4. We opined that a reasonable

25

interpretation fell somewhere between their positions, *Id.*, and concluded that the appellant's emergency room visits "were sufficiently related" to the emergency proclamation for immunity to apply. *Id.* at *5.

*Constantine* recognized statutory immunity under PS § 14-3A-06 as a fact-bound inquiry that required a relationship between the provider's actions that caused an alleged breach of care and the emergency health proclamation. But in *Constantine*, there was no dispute that the patient sought COVID-related care—although she never was found, for lack of testing, to have the virus, we found an indisputable nexus between the care that patient sought and COVID itself. As a result, that case wasn't a great vehicle to consider the outer contours of the immunity created by § 14-3A-06, and we resolved it on its facts.

This case is different. Upper Chesapeake cared for Mr. Smith as a suspected COVID patient until he tested negative for the virus on April 11. But because of the hospital's Emergency Response Plan, he remained under COVID precautions in the ICU until April 22. After April 11, he received the care underlying his claims—that care didn't grow out of any diagnosis that he had COVID, but was influenced by the hospital's response to COVID. The ongoing health emergency and the hospital's good faith compliance with the Governor's proclamation and the Department's guidance required the hospital to change how it delivered care to everyone, including Mr. Smith. For instance, on March 3, 2020, the Department provided criteria for evaluating PUI that matched Mr. Smith's presentation, and advised county health departments that "[f]ailure to meet a PUI does not definitively exclude the possibility of COVID-19" and that healthcare providers who suspected COVID-19 should manage the patient "using Standard, Contact, and Airborne Precautions

26

with eye protection until the diagnosis is excluded." Md. Dep't of Health, Infectious Disease Epidemiology and Outbreak Response Bureau, Coronavirus Disease 2019 (COVID-19) Update 10, 14 (Mar. 3, 2020), Md. State Archives, Dept's Collection, *archived at* https://perma.cc/W9SK-7VD2. The Department's guidance advised further that healthcare providers should evaluate all confirmed COVID-19 and PUI patients in Airborne Infection Isolation Rooms, prioritize those rooms "for the care of hospitalized patients who are symptomatic with severe illness and for those needing procedures that could generate infectious aerosols," like Mr. Smith, and wear PPE when caring for those patients. *Id.* at 13. Upper Chesapeake provided care consistent with this guidance to Mr. Smith until April 22, the time during which he developed the deep tissue injury underlying his claims in this case. And the hospital's records reflect its application of the COVID-19 response policies to Mr. Smith in a manner consistent with his clinical presentation. Because the hospital's good faith compliance with the emergency health proclamation altered its delivery of care, the care Mr. Smith received from the hospital in this case is entitled to immunity under the statute.

We don't read PS § 14-3A-06 to confer absolute immunity for any action taken by any healthcare provider during a declared catastrophic health emergency. The statute asks whether the care is being delivered in good faith "under a catastrophic health emergency proclamation," PS § 14-3A-06, and a provider that didn't respond to a declared emergency or that implemented protocols inconsistent with professional or regulatory good faith wouldn't be entitled to immunity under § 14-3A-06. In this case, though, there is no allegation, let alone evidence, that Upper Chesapeake failed to devise or implement its

27

emergency protocols in good faith. The circuit court extended statutory immunity to Upper

Chesapeake and granted summary judgment to the hospital correctly.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**